Morning, Ms. Windbauer. We see that you were appointed under the Criminal Justice Act, and the Court appreciates your willingness to accept the appointment. Thank you, Your Honor. Good morning, and may it please the Court. My name is Katie Windbauer, and I represent the appellant, Walter Holmes, Jr. We are here today due to shortcomings in the administration of justice in Mr. Holmes, Jr.'s trial and subsequent sentencing. Although we raised four issues on appeal, I want to focus today specifically on two of those issues. First, the sequestration order, and second, the Brady violation. As this Court will recall, Mr. Holmes, Jr. was indicted on a drug conspiracy charge with four other individuals. One of those was his father, Walter Holmes, Sr. At the time of trial, Mr. Holmes, Sr. had entered a guilty plea to the conspiracy, and Mr. Holmes, Jr. intended to call his father as a witness. On the third morning of trial before Mr. Holmes, Sr. was able to testify, the government provided audio recordings of jail phone calls between Mr. Holmes, Jr. and his father, and the government represented that in those recordings, Mr. Holmes, Jr. was relaying specific testimony from the trial and was referencing specifically who testified and how Mr. Holmes, Sr. should testify. Can I jump ahead, because I have a good handle on those facts. The sequestration order, was it in writing or was it oral, and what exactly did it say? Thank you, Your Honor. The sequestration order was oral, and so what happened was, on the first day of trial, defense counsel simply requested the sequestration of witnesses. The court then stated, quote, it is so ordered, end quote. There was no written sequestration order, there were no further limitations placed on the sequestration of witnesses, or any further restrictions as far as witness communication. Is our review affected by the fact that it was requested by defense? Your Honor, I don't think so. I get the point that defense did request the sequestration of witnesses. However, I think, you know, within my argument, part of the argument is that Mr. Holmes, Jr., as a defendant, wasn't subject to the specific sequestration. But second, it really turns to the facts of what those conversations were, and that Mr. Holmes, Jr. did not provide a play-by-play of testimony, and did not tell Mr. Holmes, Sr. to tailor his testimony or to testify to specific things. Mr. Holmes, Jr. was really telling his father to the importance of taking the stand and to testify truthfully. And I can't imagine a world in which prosecution, either through its case agent or the prosecutor, isn't having those same conversations with witnesses for the government during trial. You know, the need for you to take the stand and to testify truthfully. But that's expressly authorized by the rule, the case agent conversations, right? Your Honor, I think Rule 615 excludes certain people, one being the case agent, one being the defendant. But the sequestration order, excuse me, Rule 615 specifies that it's the sequestration of witnesses from the courtroom. And after trial, that Rule 615 was actually amended. It was effective after the trial to specify those further restrictions. Yeah, that's always the way I understood the rule to work. A hundred years ago when I tried cases, and I wrote a dissent in Engelman sort of expressing that, but I lost. I was in the minority. So wouldn't Engelman essentially control this situation then? Yes, Your Honor. I do believe Engelman is controlling. And I specifically referenced your dissent as kind of a part of my argument. But I lost. Right. But Your Honor, great argument. I think the dissent and the majority opinion both go in Mr. Engelman's junior's favor, quite honestly. Because the Engelman case, what that said was that the district court erred because it didn't hold an evidentiary hearing to determine how the communications violated the order and how they prejudiced the defendant. And in this case, and that was the opinion in Engelman. In this case, defense counsel was not provided any opportunity to actually listen to the recordings. The district court basically said, and I'm paraphrasing, go talk to your client. And if you find out that he spoke with his father, you have no further argument. And so defense counsel couldn't even listen to the recordings to know the substance of how the order was violated, the extent of it, or to make proper arguments regarding the remedy. It's important to note that- The district court did listen to it though, didn't it? The district court did say it listened to portions of the recordings. And made findings that were along the lines of leading the witness and disclosing testimony, that kind of thing. Yes, Your Honor. The district court found that consistent with the government's kind of proffered summarization of the recordings that a play-by-play of testimony was provided. A review of those recordings though shows it wasn't. Are the recordings in the record for us? They are, Your Honor. And so they're Trial Exhibits 60 through 63. The real pertinent recordings are Trial Exhibits 60 and 61. It's one phone call, but Exhibit 60 is from Mr. Holmes Jr.'s perspective, I believe, and 61 is Mr. Holmes Sr.'s perspective. So it's the same conversation, but different audio. And it's right around the seven minute mark, I believe, in those recordings. Maybe I'm mistaken, but I sure didn't read your argument in the briefs to be that there was some sort of factual error here. Maybe I missed that, but is that what you argued in the briefs? Your Honor, yes. That's part of our argument. Several points within that argument. First, that he wasn't subject to the sequestration order. And I get that's inconsistent with Engelman, but again... Oh, I thought it was right, but yes. But our second argument was that part of the District Court's abuse of discretion was a finding of clearly erroneous facts here, relying on clearly erroneous facts, that there was no play-by-play of testimony. Well, it depends on how many plays you're summarizing, right? There are big plays and small plays, and on the replays, they just show the big plays. Do you think it summarized the big plays and not all the plays? Your Honor, here's what I think it summarized, was my client, Mr. Holmes, Jr., specifically said that a certain witness testified, and he said something, this isn't an exact quote, but she doesn't even know me. And there was an expletive. Proceed. Thank you. So he said, she doesn't even know me, this witness. Okay, so the witness had testified that she had met my client, Mr. Holmes, Jr. That couldn't have been countered by Mr. Holmes, Sr. So Ms. Pachinow, the witness... How do you say couldn't be? Often, you know, other people that are close as a father-son know who's around and who's not around. Sure. Go ahead. But Mr. Holmes, or excuse me, the witness, Montessa Pachinow, testified that she had met Mr. Holmes, Jr., and there was nothing involving Mr. Holmes, Sr. in that specific meeting. And so Mr. Holmes, Jr. telling his father, she's never even met me, couldn't have... Mr. Holmes, Sr. couldn't have testified to what Mrs. Pachinow did or didn't do with regard to Mr. Holmes, Jr. He wouldn't have been at any single meeting Mrs. Pachinow or Mr. Holmes, Jr. would have had. But I want to make a second point with regard to this issue. And it's that Mr. Holmes, Sr., as a co-defendant in this case, was entitled to all the same discovery materials that showed the extent of Ms. Pachinow, Ms. Piker, Mr. Dillman, several government witnesses. It showed, it had, you know, interviews, recordings, reports on the extent of what these witnesses were going to testify about at trial. And so there's another layer with this that Mr. Holmes, Sr. That wasn't a finding by the district court, though. It was not. No. About what Sr. had access to. That's correct. The district court, that wasn't taken into consideration. Now, defense counsel multiple times throughout this colloquy of the sequestration order said along the lines of, let's pump the brakes here. We need to, you know, listen to these recordings and figure out the right decision, the right remedy. And that just didn't happen. The district court, really, in my opinion Didn't defense counsel, though, also essentially concede or at least not argue that there wasn't a violation? Your Honor, I don't believe he conceded that. Defense counsel In the sentencing memo, I think for sure he conceded. In the sentencing memo, yes. He acknowledged that the court found that an order was violated because there was a two-point enhancement on Mr. Holmes, Jr.'s sentence due to the violation. It was an obstruction of justice enhancement. And so at that phase, at sentencing I don't think he conceded the court found. I think he conceded that there was, in fact, a violation, didn't he? I don't recall the exact wording. I'm sorry. But in the present, yes, I agree that he acknowledged that Mr. Holmes, Jr. was found to have violated the order. I do want to point out, though, that at the phase of sentencing, there was nothing Mr. Holmes, Jr. could have done to argue the fact that that was a determination at trial. And he could only benefit from acknowledging that. At the sentencing phase, after you've been convicted, acceptance of responsibility is part of the equation. And so it's kind of a rock and a hard place of, the judge has made this determination. I can't change that at the sentencing phase. And so let's acknowledge it and move on. Although the obstruction was based on that situation, right? Was based on the violation. It was, Your Honor. So it was that issue anyway. Yeah. And defense counsel objected to it. He maintained the objection throughout the pre-sentence report. It was in the sentencing memorandum that the objection was not, he had made the objection in the pre-sentence report and then in the sentencing memo was acknowledging that enhancement. But he did move for a mistrial on this basis of excluding a defense witness, the most severe sanction a court can give to a defendant, and then maintain that objection throughout the pre-sentence report. I'm getting into my rebuttal time, but I want to touch briefly on the suppression of material impeachment evidence. And I just want to note that we're urging this court to review whether the evidence was material under a de novo standard. That comports with the Eighth Circuit case, United States versus Dons Vargas. And it also has rationale laid out in the Brody case that was cited that's out of the D.C. Circuit. What's really important with regard to the Brady violation is those Facebook messages and the report pertaining to the government's main witness, Ms. Aisha Piker. The government's case largely centered around Ms. Piker. She was the main witness and the government mentioned in closing, you can find all elements and you can find the 40 gram sentence quantity, drug quantity, based on Ms. Piker's testimony. And so it's no doubt that she was the most important witness for the government and defense did not have these materials showing in real time her messages during the same time frame of the drug conspiracy alleged here, that she was actually exchanging messages with another separately indicted, separate drug distributor. And those messages showed that he, this separate drug distributor, was saying things like, I want to set you up to take care of you financially. The same story that was being told to the jury about Mr. Holmes Jr. And so we feel that the Facebook messages were absolutely imperative to impeach Ms. Piker. It was another avenue of, could have been another avenue of impeachment and absolutely should have been disclosed to defense counsel. Unless there are any other questions, I'd like to reserve the remainder of my time for rebuttal. Thank you. Very well. Thank you. Thank you. Okay. Good morning, your honors, and may it please the court. My name is David Rappenegger and I represent the United States in this matter. Your honors, I believe the record in this case shows that Mr. Holmes Jr. received a fair trial and that there are no errors for this court to correct. I'd like to start my argument essentially where the appellant started with what did the order say? And I think the case law in the Eighth Circuit makes clear that the way that this court reviews what the order said in a case like this where there was a general or generic sequestration order is we need to look to the record. And we need to ask not only what did the judge thought the order meant, but what did the parties think the order meant? And I think here it's important to look toward the pre-trial conference or I'm sorry, the, yes, that's right, the pre-trial conference that had to deal with the sequestration violation preceding the third day of trial. I believe it's in the... Why wouldn't you start with what the order said? I think here, your honor... Because the order didn't say anything, right? The order didn't say much. And I think the real important parts from the order are that it asked for sequestration in general terms and not for a specific order under Rule 615. And also that it was requested by defense. At that point, though, I think we're left wanting for more. So I think at that point we must go to the record of the conference that happened where the parties discussed the order. And I understand I was on the dissent side. But boy, when I did what you do, invoking the rule meant that the witness couldn't be in the room. And that was it. I mean, thank God the statute of limitations is run. But I can't tell you how many times I went to witnesses during prep and said, testimony has been X and such. What's your response to that? And, you know, that kind of thing. I understand Engelman went the other way. But it seems like there ought to be some clarity in that. And I understand that, Your Honor, very much. That there should be notice to the defendants. And I certainly wouldn't agree that defendants need to have notice. However, in a case like this, I think it's clear that the defendant did know what this order meant, even though it was a generic order. And I think, as the Court pointed out, the defense counsel's statements during the conference leading up to things, there was no objection to the fact that this type of communication was prohibited. And there was no objection to the fact that the defendant violated the sequestration order in the sentencing memorandum as well. You might be right. Defense counsel may have understood that. It doesn't necessarily mean the defendant understood that. But it is what it is. And I would agree with that, Your Honor, that here we're kind of reading the tea leaves into what we think the defendant knew. But I think the statements of defense counsel are going to be of primary importance there and that the defense counsel admitted and, you know, through counsel, defendant conceded that he did commit a type of communication that was a violation of the order. All right. What point did he concede the violation? I mean, I see it in the sentencing memorandum. I'm not sure if that can act as a waiver to what happened at the time. If you got a case that says that, it'd be helpful. Your Honor, we cited the Alano case that talks a little bit about waiver. But I would just say that it is, I think, important in this case that the first time the defense, the appellant here now has raised the issue of whether or not the sequestration order did apply to him actually was on appeal. All of the prior objections were really to the remedy of the sequestration violation, which was the exclusion of Holmes Sr. Yeah. So that might, I mean, failure to object is a forfeiture, not a waiver, right? You're correct, Your Honor. Okay. So we'd still review that for plain error. Yes. All right. But, I mean, they do actually concede in the sentencing memorandum. They concede the violation. They do, Your Honor. And if you want the exact language, the exact language is just that they begin the paragraph, the second full paragraph on page four, and I'm at document number 351. While the recordings of the conversations established that Holmes Jr. did, in fact, violate the court's sequestration order, then they go on to say the court already imposed a sanction for this violation. And they're discussing there the obstruction of justice enhancement. Do you have any cases or anything that say this sort of later, what I think is pretty clearly a waiver situation, would apply to what happened at trial? I don't have any cases at my fingertips here, Your Honor. I'm sorry. How about this, what I now understand to be a sort of clear error fact question about what's in the tapes, whether there was a sharing of the testimony and coaching of the witness, so to speak. Do you have a response to that? Yes, I do, Your Honor. I think the case law in this circuit makes clear that under the abuse of discretion standard, the court should afford a pretty high level of deference to the district court's findings of fact. It's not like I would be encouraging the court, though, not to listen to the recordings or anything like that. But I think the court should listen to the recordings under that kind of lens of affording deference to the district court. So if the court were to disagree, maybe, with the interpretation of the district court's findings of fact, I don't believe that would be enough to overturn and find facts. We'd have to find clear error. I believe so, Your Honor. So I guess my question is, what's on the tapes? What's going to show us that it's not clearly erroneous to find that there was nefarious or contradictory to the understanding of the sequestration order? Well, if the court were to listen to the tapes, they would find there are four recordings that have been submitted. There are two phone calls, and you get each phone call from the perspective of the defendant and from the perspective of Walter Sr. And listening to all four can be helpful because sometimes it's hard to hear each party. So you'll hear the primary caller the clearest. On the first set of calls, as we noted, there's conversation between the defendant and his father about the two women that testified at trial. I think it's key here, and it was important for the district court that they refer to one of the women as the devil at trial. With other words added sometimes. Go ahead. There were some other words, and I'm not going to play by play. No, but that does give the flavor of what's going on. It does, yes. They're talking about, though, these two women that both testified at trial. There's a statement that I wrote down, or I just wrote down, that it sounds like Junior is kind of saying he wants Senior to know what's coming at him. He does mention that Senior's seen the discovery. But for me, I listened to them, and I clearly thought that they were talking about what had happened at trial that day. The next call happens after day two of trial, and they have additional conversations about what happened at trial. And my interpretation and the district court's interpretation was that they were trying to establish what Holmes Senior would say. And the end of the conversation, I think, sums up the point there is I believe Holmes Senior says something like, I got a fall on the sword. Somebody's got a fall on the sword. The gist that I got from the conversation, and I think it matches with the district court, was that Holmes Senior was going to either take the fall for Holmes Junior, or he was going to say things that would have exonerated him from some of the conduct. I think what we would be looking for for clearly erroneous, though, I think would be much more than a different interpretation. I think clearly erroneous would mean something like if appellant brought forward some facts to say one of those people wasn't even Holmes Senior. I think we would need to look to something more like that to say the district court was completely mistaken here in viewing this as what they viewed it. But it is very much a call between Holmes Junior and Senior. They are talking about trial, happenings at trial. And in the second call, I do believe they are talking about what Holmes Senior would be expected to testify to. But I would encourage the court to listen to the tapes. Is Perry v. Leek the closest United States Supreme Court case on this issue? It's a 1970, no, 89, 1989 decision of the court. I don't have my notes on that one, but I do have it listed as a helpful case for us. I apologize I can't give you more on that point. I have a lot of paper here, but I didn't bring that. No, that's okay. I do want to say something about Engelman, though, because, and this is where I'm going to have to, I'm sorry, Judge Grunder, I have a feeling you're going to disagree with some of what I'm going to say here. But I think there is a point of Engelman that is helpful to the government in this case. And that is that I think the fact that Engelman was remanded is helpful for the government, because it does show that even non-excludable people can violate sequestration orders in some cases. And that's where I think the content of the communication is very important for the court to look at, not just the person who made the communication. So I think Engelman is actually a helpful case for both parties. It gives a good framework, I think, for how to... Well, there are many sentences in Engelman that are just great for you. Yes. But proceed with your argument. That was all I was going to say on that. Though I still think it was wrong. Look, I do understand that. And I agree with your point about notice, but I do think that the majority in Engelman is also helpful to us as well. I agree. If there are no further questions on that issue, Your Honor, I think I'm going to work to some of my comments now on the Brady issue. As to the standard of review, we're arguing here, Your Honor, that this case should be reviewed under the abusive discretion standard. We've cited three cases in favor of that. The Anwar case, the Ruzicka case, and the Smart case. I think the Smart case is particularly... It has a helpful fact in it that I just want to point the Court to. In the Smart case, I didn't find many cases that dealt with a similar situation here where you had Brady material, you had nondisclosed material that went to a line of impeachment that was not brought up at trial. That's where I think the Smart case provides one helpful fact, in that in the Smart case, one of the nondisclosed items was related to a witness who did not testify at trial. It was impeachment information that could have been used against that witness, had that witness testified at trial. The Court there still found there was no violation, and it was still cumulative, despite the fact the witness didn't testify. Where I think the Donas-Vargas case is distinguishable here, Your Honors, is that the Donas-Vargas case was not a cumulative evidence case. The Donas-Vargas case involved the nondisclosure of payments made to a witness, and it involved a line of impeachment that was not available at trial, and it was unknown at the time of trial. So there it was not particularly, at least relevant to the outcome, that the fact that the witness was thoroughly impeached on the stand. It was because this line of questioning was completely unknown to defense counsel at the time, so they couldn't have brought up any questions based on the payments. Here, I don't think that's the case. As we lay out in our brief, and I think I would draw the Court's attention to the United States response to the defendant's second motion for new trial as well, we lay out what I think is important here as to the timing and the contents of the nondisclosed information. So from the start, I think the proper framework to evaluate this is that the line of impeachment that would have been, that was available to defense counsel prior to trial, and that would have been aided by these nondisclosure materials, was simply that Aisha Piker was also dealing drugs for other people. That was available prior to trial through two different interviews with her, where she admitted she was dealing drugs for other people, and she admitted it was happening at the same time she was dealing for Holmes. Those interviews also included names that defense counsel could have used at trial to open a line of impeachment into other people that she was dealing for at the same time. I do want to draw an important distinction though, I think, my colleague here brought up the Facebook messages, and the Facebook messages do have something that I think is important to distinguish here. Mr. Holmes Jr. was convicted for distributing fentanyl powder in all the Facebook messages and all the information that the defendant received pre-trial that talks about Aisha Piker dealing for other people. She always references dealing pills, fentanyl pills. So I think what this line of impeachment would have been, should be narrowly tailored to the fact that she was dealing for other people, and I do not believe it would have helped the defense in any way with the quantity that the jury found. They do make, I believe, a brief argument that this could have drawn some negative inferences to the quantity that the jury had to find through Aisha Piker. I don't think that would have been possible here, because all of those materials dealt with pills, not with fentanyl powder. She was consistent that she was only dealing fentanyl powder for Walter Holmes Jr. Counsel, you both talk about D.C. cases a lot on this. Have we ever adopted the line that they have, you know, they draw some lines about what's cumulative, what's not cumulative, what's this, what's that? Has the Eighth Circuit ever cited those cases or relied on those cases? In my research, Your Honor, I did not find any instances where that line of thinking was adopted in the Eighth Circuit. Yeah, or is it even referenced in the Eighth Circuit? Pardon my ignorance. I didn't find any cases. I'm not saying there aren't, but I didn't find any, Your Honor. Sure. If there are no further questions from the judges, I would just say thank you for your time today, Your Honors, and we would ask the Court to affirm Mr. Holmes Jr.'s conviction. Thank you. Thank you, Mr. Rappanacker. Ms. Windbauer, you have some rebuttal time. Thank you, Your Honors. Just to go back to the sequestration order, it is important to note that Mr. Holmes Jr. did not waive that at the time of trial. I understand, you know, there's the issue within the sentencing memo. It's pretty clear in the sentencing memo. But again, you know, at that point in sentencing, it's not as though Defense Counsel could have persuaded the judge to say, oh, you're right, he didn't violate the order. That may be true, but it was that issue. It was what was the basis of the obstruction. It was. It absolutely was. And that objection was maintained, and it was articulated at the sentencing hearing as well. And so if we're looking at the fairness of trial, that objection was maintained through trial. It was not waived at trial. And any subsequent statements... Are you saying trial doesn't include the sentencing? Well, sentencing, as I've stated, is a separate phase where there's no remedy for this objection at the time of sentencing. There were ways in which this... Well, the remedy would be on appeal when you say that I didn't obstruct. Yeah, absolutely. The remedy is the appeal after sentencing. And so at the trial, Defense Counsel, if Defense Counsel could have listened to those recordings and made sufficient arguments and suggested other remedies, we would have a different situation. No, I'm talking about when you get just to sentencing. On the obstruction, you can just say didn't obstruct. And, Your Honor... In every respect. I mean, dispute that didn't obstruct in every way. You get my point. Yes, yes, I sure do. And Defense Counsel maintained the objection in the sentencing memorandum... Or excuse me, in the PSIR, in the pre-sentence investigation report, but made a statement that could have only helped the defendant accept responsibility at the sentencing phase. I also just want to note that the Perry case in the United States Supreme Court is really about judges' authority to instruct witnesses that they can't disclose their testimony until the end of trial. That order could have been given by the district court, but it wasn't. The district court's order was very limited. And so that's what we need to view any order in light of. Thank you, Your Honor, for your time. At what point, if any, was counsel given access to the recordings? Your Honor, the government provided the recordings to counsel that morning when the prosecutor raised the issue. However, Defense Counsel was allowed to consult with his client and not given time to actually listen to the recordings. Did Defense Counsel request time? I'm sorry to interrupt. No, no, that was my question too. Oh, good. Yes, Your Honor, he did. There's several pages within Volume 3 of the trial transcript where Defense Counsel is requesting more time. He's asking the court to slow down and to be able to assess. He, I think, asked for an hour of time and an in-camera review of the recordings. None of that happened. Thank you.